# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 24-5 consolidated with 24-6

## BRYANT GEORGE, M.D. & DURA MATER, INC.

## VERSUS

## CHRISTUS HEALTH SOUTHWESTERN LOUISIANA
## D/B/A CHRISTUS ST. PATRICK HOSPITAL

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2010-6004 c/w NO. 2011-2211
HONORABLE KENDRICK J. GUIDRY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## VAN H. KYZAR
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Van H. Kyzar, Candyce G. Perret, and Wilbur L. Stiles, Judges.

**REVERSED AND RENDERED.**

**Timothy O'Dowd**
**Samuel R. Ducote**
**O'Dowd Law Firm, LLC**
**924 Hodges Street**
**Lake Charles, LA 70601**
**(337) 310-2304**
**COUNSEL FOR PLAINTIFFS/APPELLANTS/APPELLEES:**
    **Bryant George, M.D.**
    **Dura Mater, Inc.**

**Marshall J. Simien, Jr.**
**Simien Law Firm**
**2131-A Fitzenreiter Road**
**Lake Charles, LA 70601**
**(337) 497-0022**
**COUNSEL FOR DEFENDANT/APPELLANT/APPELLEE:**
    **Christus Health Southwestern Louisiana**
    **d/b/a Christus St. Patrick Hospital**

**Richard T. Simmons, Jr.**
**Hailey McNamara**
**3445 N. Causeway Boulevard, Suite 800**
**Metairie, LA 70002**
**(504) 836-6500**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Kathleen L. DeBruhl & Associates, L.L.C.**
    **Kathleen L. DeBruhl**
    **Gilbert F. Ganucheau, Jr.**

**KYZAR, Judge.**

In these consolidated appeals, both parties appeal from the jury verdict finding both the plaintiffs, Dr. Bryant George and Dura Mater, Inc.[1] (referred to collectively as "Dr. George"), and the defendant, Christus Health Southwestern Louisiana d/b/a Christus St. Patrick Hospital (Christus), at fault in this breach of contract suit. The parties further appeal from the trial court judgment denying Christus's motion for judgment notwithstanding the verdict (JNOV) and its partial grant of Dr. George's JNOV motion, by which it amended the jury verdict to find that Christus's breach of contract was a proximate cause of Dr. George's damages and increased its percentage of fault from 8% to 35%. For the reasons set forth, we reverse the judgment of the trial court granting the JNOV in favor of Dr. George and denying Christus's motion for JNOV. We further render judgment in favor of Christus, granting its motion for JNOV and dismissing Dr. George's claims against it, with prejudice.

## FACTS AND PROCEDURAL HISTORY

In January 2009, Dr. George and Christus entered into a standard agreement used by Christus when recruiting physicians for its facility in Lake Charles.[2] According to Section 2.2 of the agreement, Dr. George was required to engage in the full-time practice of neurosurgery in the community serviced by Christus as well as to obtain medical staff membership, admission credentials, and privileges at Christus. He was further required to "continuously maintain" his credentials and privileges throughout the one-year term, with the failure to do so resulting in a breach

---

[1] Dura Mater, Inc. is Dr. George's professional corporation.

[2] A synopsis of the relevant facts is taken from the voluminous record of the testimony and evidence introduced in this case. The facts pertaining to the contract between the parties was taken from the testimony of Anne Billeaudeaux, Christus's Director of Business Development and Recruiting.

of the agreement. Should Dr. George breach the agreement, Christus, in addition to stopping his guaranteed payments, could recover those amounts as well as the amounts paid to him as a sign-on bonus and moving expenses. Dr. George was further required to comply with all of the Medical Staff Bylaws and Rules and Regulations. As Christus was a faith-based hospital, Dr. George was required to conduct his practice pursuant to the health care standards set forth by the Roman Catholic Church as well as other standards, including those established by the Joint Commission by which Christus was accredited.[3]

Dr. George's payment package totaled $1,289,656.00, of which $104,971.33 was the monthly amount guaranteed by Christus, less any amount collected by him each month. The guaranteed annual amount consisted of $956,000.00 in income and $303,656.00 in first year start-up expenses. Dr. George also received a $20,000.00 sign-up bonus and up to $10,000.00 in relocation expenses. Pursuant to the agreement, the guaranteed amounts would be forgiven provided Dr. George continued to satisfy all of the physician responsibilities listed in Article 2 of the agreement and had not defaulted on the loan. However, the guaranteed amounts would have to be repaid if Dr. George left both Christus and the community it served. The agreement further provided Christus the right of immediate termination should Dr. George's actions endanger patient health or safety or if his membership or privileges were terminated or suspended.

This protracted litigation, which began in 2010, results from two consolidated lawsuits filed by Dr. George, wherein he sought damages based on breach of contract, detrimental reliance, and legal malpractice. Along with Christus, Dr. George also

---

[3] "The Joint Commission is the nation's oldest and largest standards-setting and accrediting body in health care." *Facts About the Joint Commission*, https://www.jointcommission.org/who-we-are/facts-about-the-joint-commission/history-of-the-joint-commission/ (last visited July 3, 2024).

2

named as defendants his former counsel, Kathleen L. DeBruhl & Associates, L.L.C., Kathleen L. DeBruhl, and Gilbert F. Ganucheau, Jr. (referred to collectively as "the DeBruhl defendants").

This litigation stems from actions taken by Christus beginning on September 9, 2009, whereby it summarily suspended Dr. George's privileges after allegations of impairment were made against him by operating room (OR) staff after he appeared to fall asleep and experienced difficulty suturing during two procedures and then could not be located prior to a third procedure. An ad hoc subcommittee (AHS), composed of Dr. Richard Gilmore, the Medical Staff President, and four other physicians, was appointed to investigate the incident,. During the September 14, 2009 hearing, Dr. George denied that he was impaired due to drugs, rather claiming that he was fatigued on September 9, from a combination of traveling, manual labor, and paperwork. He blamed his depth perception problems on his new bifocals and the OR's inability to contact him due to poor cell phone reception. He further did not recall being asked by Bernard Leger, Christus's Administrator, and Dr. David Engleking, Vice-President of Medical Affairs, to submit to a drug test on September 9. During the September 16 AHS meeting, Dr. George admitted that he was impaired during his September 9 procedures due to sleep deprivation. He agreed to request a medical leave of absence (LOA) and to undergo an evaluation through the Physician's Health Foundation of Louisiana (PHFL).[4]

At the same time as the AHS investigation, a wrong-level surgery performed by Dr. George on July 21, 2009, was being reviewed by Christus's Peer Review

---

[4] "It is the primary role of the Physicians' Health Foundation of Louisiana (PHFL) Physicians Health Program (PHP) to offer assistance to physicians who may be suffering from difficulties such as substance use issues, depression, anxiety, etc., in addition to a host of physical ailments and maladaptive behavioral patterns." https://www.lsbme.la.gov/licensure/php (last visited July 3, 2024).

3

Committee (PRC). Present at the meeting were eight physicians, including Dr. Erich Wolf, a neurosurgeon, who opined that a wrong-level surgery should not happen. He explained that Dr. George was scheduled to perform a fusion at the C6-7 disc level. However, after the procedure was completed, an x-ray revealed that the C5-6 level had been fused instead of the C6-7 level, after which Dr. George fused the correct level, with the result that the patient had a two-level fusion. It was Dr. Wolf's opinion, based on the MRI, that he would not have fused either level. Thereafter, the PRC concluded that "[t]here is no documentation of the level in the [History & Physical]; the H&P was not completed by a privileged NP; the wrong level was operated on; the surgeon was not careful in choosing the site intraoperatively and ignored warnings of staff in the O.R.; and the consent was poorly filled out." As a result of this finding, the PRC ordered Dr. John Raggio, a board-certified neurosurgeon, to perform a retrospective review (FPPE) [5] of Dr. George's procedures. [6]

Dr. George's FPPE was considered by the PRC on October 20, 2009, while he was on LOA for evaluation by the PHFL. It was noted during the meeting that "a pattern of poor pre- and post-op documentation[]" had developed after he completed his seven concurrently proctored procedures, as his medical records contained no indications for surgery and incomplete consent forms. It was the recommendation of the PRC, based on the findings of the FPPE, that Dr. George's privileges not be reinstated upon his request.

---

[5] Focused Professional Practice Evaluation.

[6] Dr. Raggio, who had retired from Christus at the end of 2007, was hired by Christus to perform prospective, concurrent, and retrospective monitoring of Dr. George in order to determine his current competency to perform neurosurgery as Christus was unable to verify this due to the closure of his former hospitals following Hurricane Katrina.

4

Following Dr. George's February 25, 2010 request for reinstatement, a special-called meeting of the hospital's Credentials Committee (CC) was held on March 9, 2010, attended by various physicians as well as Dr. Carole Altier, Chief of Surgery, Dr. Noble, Mr. Leger, Dr. Engleking, and Linda Van Winkle, the Medical Staff Services Manager. After reviewing excerpts from the PRC's September 15 and October 20 meetings, as well as additional information related to the wrong-level surgery, the results of Dr. George's FPPE, and the PRC's recommendation not to reinstate, Dr. Altier was not in favor of reinstating Dr. George's privileges. The CC then recommended "that Dr. George's request for reinstatement not be approved, based upon the information presented at today's meeting, the recommendations of the Peer Review Committee and the Chief of Surgery, and in the interest of patient safety."

At a special-called March 16, 2010 meeting of the Medical Executive Committee (MEC), it was recommended, after reviewing the recommendations of the PRC, Dr. Altier, and the CC, that Dr. George be notified of and offered the opportunity to respond to peer review issues raised by his FPPE. A March 17, 2010 letter from the MEC to Dr. George informed him of its concerns:

> The Executive Committee is also considering the recommendations of the Peer Review Committee, Chief of Surgery Section, and the Credentials Committee regarding your reinstatement. Additionally the Executive Committee reviewed the information from the Peer Review Committee regarding the Focused Professional Practice Evaluation ("FPPE") which was completed in October 2009.
>
> During your leave of absence, some serious concerns about your standard of care were raised as a result of the cases reviewed as part of your FPPE plan. The FPPE is a focused review of physician activity at the hospital; all members of the staff are subject to this process. The results of the FPPE are attached for your review. Some of the specific concerns are:
>
> - Questionable indications for surgery, due to poor documentation and lack of supportive data (e.g.,

5

radiographic findings, neurologic exam findings) in the chart to justify procedure

- Deficiencies in operative consent forms
- Inadequate H&Ps prior to surgery
- Overall poor documentation in the medical record, not improving over time
- Questionable surgical technique and skill
- Wrong level surgery
- Unacceptable behavior during scheduled cases the morning of September 9, 2009

Due to the circumstances and timing surrounding your LOA the MEC has not had an opportunity to discuss the results of the FPPE with you. Therefore we would like to invite you to attend the next MEC meeting on April 6, [2010] at 12:30 p.m. in the Administrative Conference room. Please be prepared to discuss in detail the cases listed on the attachment. Please contact Carrie Vincent in Medical Records for access to the charts.

Your attendance at this meeting and your input regarding these results is critical in order for the Executive Committee to evaluate your request for return from LOA. If you have any questions please contact Dr. Dave Engleking.

According to the minutes of the April 6 meeting, Dr. George commented on each case listed in the FPPE and said "that he 'could provide all the indications for the procedures'[,]" and although he had folders with him, he did not submit them to the MEC. In response to a question, Dr. George stated that the OR was unable to contact him on September 9, because his phone failed to ring. Regarding the wrong-level surgery, he claimed that although the patient was informed about the two-level fusion prior to surgery, her consent form was not amended.

Following Dr. George's departure, the MEC agreed "that Dr. George has an issue with insufficient documentation in his medical records." It further noted several concerns related to the wrong-level surgery: (1) Dr. George ignored suggestions made by OR staff during the procedure; (2) the peer reviewer stated that he would not have done the procedure based on the patient's radiological findings;

6

(3) it is inappropriate to determine intraoperatively that a patient requires a two-level fusion when the need for such was not discussed with or consented to by the patient; and (4) nothing in the chart indicated that Dr. George discussed a two-level fusion with the patient prior to surgery. It was further noted by two members that although Dr. George claimed that his patients had all experienced excellent outcomes post-surgery, they were aware that two of his patients were not doing well. At the close of the hearing, the MEC recommended that Dr. George's request for reinstatement be denied for the reasons outlined in its March 17 letter. It further noted that based on its adverse recommendation, Dr. George was entitled "'to procedural rights established by the Medical Staff Bylaws and Fair Play Plan.'" He was notified that same day that his request was denied.

Despite his entitlement to a review of this decision, Dr. George, upon the advice of the DeBruhl defendants, waived his right to the hearing based on alleged "assurances" from Christus as to the information it would report to the National Practitioner Data Bank (NPDB).[7] On May 20, 2009, Christus reported to the NPDB that it had revoked Dr. George's privileges based on substandard or inadequate care. Its justification for this action was "[r]evocation of privileges due to unsafe practice and substandard care." As a result of Christus's use of the term "unsafe practice," Dr. George claimed that he was unable to obtain privileges at other hospitals.

Dr. George filed his original breach of contract suit against Christus on December 3, 2010.[8] He filed his second suit against Christus and the DeBruhl

---

[7] The NPDB is a web-based repository of reports containing information on medical malpractice payments and certain adverse actions related to health care practitioners, providers, and suppliers . . . which prevents practitioners from moving state to state without disclosure or discovery of previous damaging performance. https://www.npdb.hrsa.gov/topNavigation/aboutUs .jsp (last visited July 7, 2024).

[8] Docket number 2010-6004.

7

defendants on May 13, 2011, seeking damages based on breach of contract, detrimental reliance, and legal malpractice.[9] The suits were consolidated on January 12, 2012.

Pursuant to his third-amended and supplemental petition, Dr. George alleged numerous breaches of contract on the part of Christus: (1) it staffed his medical office with employees "who lacked the proper qualifications, experience, work ethic and acumen for the task contemplated[;]" (2) it failed to provide him "access to suitable operating facilities, proper equipment and competent staff[;]" (3) it only allowed him to use one medical device vendor; (4) it failed to conduct a good faith investigation into the events of September 9; (5) the PRC voted to deny his request for reinstatement while he was on LOA and without obtaining his input; and (6) it wrongfully refused his request for reinstatement.

As to Christus's wrongful refusal to reinstate his privileges, Dr. George specifically alleged that the recommendations of the PRC, CC, and MEC were based upon information that was flawed as it was not compiled by privileged neurosurgeons. He further alleged that these committees failed to notify him as contractually required before considering peer review issues related to his practice. He further claimed that the MEC had already decided to deny his request before the April 6 meeting and that it failed to notify him that he would be required to rebut the FPPE during that meeting. Additionally, Dr. George alleged that Christus acted with malice towards him as it did not act in the reasonable belief that its actions were taken in furtherance of quality health care. He based this on the fact that Dr. Raggio, who did not possess neurosurgery privileges at Christus, was unqualified to perform

---

[9] Docket number 2011-2211.

his FPPE since his monitoring plan stated that his retrospective case review would be performed by a neurosurgeon with privileges at Christus.

Dr. George also alleged that Christus was liable to him under the theory of detrimental reliance because it agreed to use "substandard or inadequate care" when reporting to the NPDB in exchange for his waiver of his right to an evidentiary hearing but instead used "unsafe practices" in reporting to the NPDB.[10]

In answer, Christus pled numerous affirmative defenses, including breach of contract and/or fault; immunity from liability pursuant to the Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11011, et seq.; and immunity and protection from discovery for peer review actions pursuant to La.R.S. 13:3715.3. As plaintiff in reconvention, Christus sought damages for breach of contract and unjust enrichment.

Following a lengthy and contentious procedural history, especially with regard to discovery issues, this matter finally proceeded to a jury trial on August 15, 2022. At the close of the ten-day trial, the jury rendered the following verdict:

1. Did St. Patrick Hospital act without malice and in the reasonable belief that denial of reinstatement of privileges was warranted by the facts known to it?

Yes _____ No __✓__

If your answer to Question No. 1 is "YES", then please proceed to Question No. 6.
If your answer to Question No. 1 is "NO", then please proceed to Question No. 2.

2. Did the Plaintiffs prove by a preponderance of the evidence that St. Patrick Hospital:

| a. | did not act in the reasonable belief that the denial of Dr. Bryant George's request for reinstatement of privileges was done in the furtherance of quality health care? | Yes _____ No __✓__ |
|---|---|---|
| b. | did not make a reasonable effort to obtain the facts related to its decision to deny Dr. Bryant | |

---

[10] In addition to seeking damages based on unfair trade practices, Dr. George also sought declaratory judgments on whether he was liable to Christus for amounts paid to him under the agreement and whether the agreement should be rendered void as being a restraint against business. However, as these issues were not considered by the jury, they are not pertinent to these appeals.

9

| | | |
|---|---|---|
| | George's request for reinstatement of privileges? | Yes _✓_ No ___ |
| c. | denied Dr. Bryant George's request for reinstatement of privileges without providing him adequate notice and hearing procedures as were fair to him under the circumstances? | Yes _✓_ No ___ |
| d. | did not act in the reasonable belief that the denial of Dr. Bryant George's request for reinstatement of privileges was warranted by the facts? | Yes ___ No _✓_ |

If your answer is "NO" to all of the Question Nos. 2a, 2b, 2c and 2d, then please proceed to Question No. 6. If your answer is "YES" to any of the Question Nos. 2a, 2b, 2c or 2d, then please proceed to Question No. 3.

3.    Did the Plaintiffs prove by a preponderance of the evidence that St. Patrick Hospital failed to comply with the contractual agreement between Plaintiffs and St. Patrick Hospital?

Yes _✓_ No ___

If your answer to Question No. 3 is "NO", then please proceed to Question No. 6. If your answer to Question No. 3 is "YES", then please proceed to Question No. 4.

4.    Did the Plaintiffs prove by a preponderance of the evidence that St. Patrick Hospital's failure to substantially comply with the contractual agreement was the proximate cause of any damages to Plaintiffs?

Yes ___ No _✓_

Please proceed to Question No. 5.

5.    Did the Plaintiffs prove by a preponderance of the evidence that St. Patrick Hospital

| | | |
|---|---|---|
| a. | made a representation by conduct or word what would be reported to the National Practitioner Database (NPDB)? | Yes ___ No _✓_ |
| b. | that plaintiff relied upon the representation mentioned in "a"? | Yes _✓_ No ___ |
| c. | that plaintiff changed his position to his detriment because of the reliance mentioned in "b"? | Yes _✓_ No ___ |

6.    Did the Plaintiffs prove by a preponderance of the evidence that Kathleen L. Debruhl [sic] & Associates, L.L.C., Kathleen L. Debruhl [sic] and/or Gilbert T. Ganucheau committed acts or omissions that fell below the standard of care for an attorney?
Yes ___ No _✓_

If your answer to Question No. 6 is "YES", then proceed to Question No. 7. If your answer is "NO" do not assign any percentage of fault to Kathleen L. Debruhl [sic] & Associates, LLC, Kathleen L. Debruhl [sic] and/or Gilbert T. Ganucheau.

10

7. Did the Plaintiffs prove by a preponderance of the evidence that the acts or omissions of Kathleen L. Debruhl [sic] & Associates, LLC [sic], Kathleen L. Debruhl [sic] and/or Gilbert T. Ganucheau were the proximate cause of any damages to Plaintiffs?

Yes ___ No ___

If your answer is "YES" proceed to Question No. 8. If your answer is "NO" do not assign any percentage of fault to Kathleen L. Debruhl [sic] & Associates, LLC [sic], Kathleen L. Debruhl [sic] and/or Gilbert T. Ganucheau.

8. What, if any, percentage of fault for their damages did Plaintiffs prove by a preponderance of the evidence should be allocated to the parties listed below?

**Please note that you should only assign a percentage of fault to Plaintiff if you find that he contributed to his own injuries or is otherwise at fault.**

**Bryant George, MD**                                            **92%**

**St. Patrick Hospital**                                          **8%**
(If you have answered "NO" to Question 1, 2 a-d, 3, 4, and 5 a-c, do not assign a percentage of fault to St. Patrick Hospital.

**Kathleen L. Dubruhl [sic] & Associates, LLC [sic],        0%**
**Kathleen L. Dubruhl [sic] and/or Gilbert T. Ganucheau**
(If you have answered "NO" to Questions 6 or 7, do not assign a percentage of fault to Kathleen L. Dubruhl [sic] & Associates, LLC [sic], Kathleen L. Dubruhl [sic] and/or Gilbert T. Ganucheau).

**(The percentages must add up to 100%.)**

Please proceed to Question 9.

9. What amount of money, if any for the following categories of damages did Plaintiffs prove by a preponderance of the evidence was proximately caused by the Defendant(s)?

Loss of Past Income:                            $1,000,000.00

Loss of Future Earning Capacity:               $          0.00

General Damages:                               $          0.00

10. Did Kathleen Debruhl [sic] and [sic] Associates [sic] prove by a preponderance of the evidence that the Debruhl [sic] defendants actually performed legal services for Dr. George?
Yes __✓__ No ___

11. If you answered "YES" to Question 10, what amount of money, if any, compensates Kathleen Debruhl [sic] and [sic] Associates [sic] for such services[?]
$23,942.50

A final judgment in accordance with the jury verdict was rendered by the trial court on September 30, 2022, finding Christus liable to Dr. George for damages in the amount of $80,000.00, and dismissing Dr. George's claims against the DeBruhl

11

defendants with prejudice. Thereafter, Dr. George moved for a JNOV, or alternatively, a new trial, seeking to have the jury's verdict amended to find that Christus's breach of contract was a proximate cause of his damages and that the damages awarded to him should be increased from $80,000.00 to $1,000,000.00. Alternatively, he argued that the trial court should grant a new trial on the damage and detrimental reliance issues. Christus also moved for a JNOV, arguing that based on the jury's finding that its actions were not a proximate cause of Dr. George's damages, the jury's verdict should be amended to find it liable for none of Dr. George's damages. It further moved for a new trial on the issue of court costs.

Following a hearing, the trial court granted in part and denied in part Dr. George's motion for JNOV. It amended the jury verdict to find that Dr. George proved by a preponderance of the evidence that Christus's breach of the agreement was a proximate cause of his damages. It further amended the jury verdict to reduce Dr. George's percentage of fault from 92% to 65% and to raise Christus's percentage of fault from 8% to 35%. Based on this finding, the trial court denied Christus's motion for JNOV. The trial court further denied Christus's motion for new trial on the issue of costs, holding that each party would be responsible for their own costs. A final judgment was rendered by the trial court on March 17, 2023. It is from this judgment that both parties appeal.

On appeal, Christus raises the following four assignments of error:

1.  The Jury erred in failing to find that CHRISTUS acted without malice and in the reasonable belief that the denial of reinstatement of privileges was warranted by the facts known to it, thereby requiring the case be dismissed.

2.  The Trial Court erred when it entered Judgment on a jury special verdict awarding Dr. George damages where there was no legal basis to do so when the Jury determined: a) CHRISTUS was not the proximate cause of resulting damages, an essential element of proof required for a breach of contract claim; and b) there was no representation made by CHRISTUS in which Dr. George

12

relied to his detriment, an essential element of proof required for a detrimental reliance claim.

3. The Trial Court erred when it denied CHRISTUS's Motion for JNOV, which sought dismissal of Dr. George's claims, when CHRISTUS submitted evidence of facts and inferences that pointed so strongly and overwhelmingly in its favor that reasonable persons could not have arrived at a contrary verdict of dismissal.

4. The Trial Court erred when it granted Dr. George's Motion for JNOV, changed the jury's verdict in order to create a legal basis for it to award Dr. George $1 million in damages, and allocated 35% fault to CHRISTUS, despite CHRISTUS having submitted evidence of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment would have concluded that Dr. George's own lack of professional competency, his behavior/conduct, his failure to be truthful with his medical licensing board, and his having caused his own damages when he consented to a 3-year prohibition from being able to perform neurosurgery, separate and apart from CHRISTUS having denied his request for reinstatement.

Dr. George also asserts the following assignments of error on appeal:

1. The Trial Court erred by instructing the jury to determine Dr. George's percentage of fault and submitting an interrogatory thereon because La. Civ. Code art. 2323 does not apply to contract claims.

2. The Trial Court erred by instructing the jury to determine Dr. George's percentage of fault and submitting an interrogatory thereon, because under Louisiana contract law, a breaching obligor cannot get a fault reduction under La. Civ. Code art. 2003 unless it proves and the trier of fact finds the obligee breached the contract and that breach directly and proximately caused the obligor's breach.

3. The Trial Court erred by failing to award the total damages determined by the jury without reduction pursuant to La. Civ. Code. art. 2323 or La. Civ. Code. art. 2003.

## OPINION

We first address Christus's second, third, and fourth assignments of error dealing with the jury's finding of a lack of causation between the actions of Christus and any damages suffered by Dr. George, as well as the granting of the JNOV in

favor of Dr. George, overturning the jury's finding on that issue and assigning 35% of the fault to Christus.

Louisiana Code of Civil Procedure Article 1811(F) provides trial courts with the authority to grant a motion for JNOV "on the issue of liability or on the issue of damages or on both issues." In *Davis v. Wal-Mart Stores, Inc.*, 00-445 pp. 4–5 (La. 11/28/00), 774 So.2d 84, 89, the Louisiana Supreme Court set forth the standard to be used in determining whether a JNOV has been properly granted:

> A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. *Smith v. Davill Petroleum Company, Inc. d/b/a/ Piggly Wiggly*, 97-1596 (La.App. 1 Cir. 12/9/98), 744 So.2d 23. See also *Powell v. RTA*, 96-0715 (La.6/18/97), 695 So.2d 1326; *Anderson v. New Orleans Public Service*, 583 So.2d 829 (La.1991); *State of Louisiana, DOTD v. Scramuzza*, 95-786 (La.App. 5 Cir. 4/3/96), 673 So.2d 1249; *Seagers v. Pailet*, 95-52 (La.App. 5 Cir. 5/10/95), 656 So.2d 700; *Engolia v. Allain*, 625 So.2d 723, 728 (La.App. 1 Cir.1993); *Adams v. Security Ins. Co. Of Hartford*, 543 So.2d 480, 486 (La.1989).

> The standard of review for a JNOV on appeal is a two part inquiry. In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether or not to grant the motion. After determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review. *Anderson v. New Orleans Public Service, Inc.*, at p. 832.

The first question presented to this court is whether the evidence before the jury as to the issue of causation for Dr. George's alleged damages was so strongly and overwhelmingly in his favor that reasonable jurors could not arrive at a contrary verdict. Put another way, the trial court should only have granted the JNOV if the evidence of causation for any damages suffered was so strongly in favor of Dr. George that reasonable men could not reach a different conclusion, not simply that he proved his case as to causation by a preponderance of the evidence.

"[A] contract is a conventional obligation, hence, it therefore follows that 'an obligor is liable for the damages caused by his failure to perform a conventional obligation. A failure to perform results from nonperformance, defective performance, or delay in performance.'" *Citi Mortg., Inc. v. Chase*, 11-661, p. 5 (La.App. 4 Cir. 12/14/11), 81 So.3d 255, 258 (quoting La.Civ.Code art. 1994), *writ denied*, 12-137 (La. 3/23/12), 85 So.3d 93.

In any damage claim, even one based on breach of contract, the plaintiff bears the burden of proving liability, causation, and damage. Failure to prove any of these elements is fatal to their claim for damages:

> The essential elements of a breach of contract are threefold. *Sanga v. Perdomo*, 14-609 (La.App. 5 Cir. 12/30/14); 167 So.3d 818, 822, *writ denied*, 15-222 (La. 6/19/15); 172 So.3d 650, citing *Favrot v. Favrot*, 10-986 (La. App. 4 Cir. 2/9/11); 68 So.3d 1099, 1108–09. First, a plaintiff in a breach of contract claim must prove the obligor undertook an obligation to perform. *Id.* Next, the plaintiff must prove that the obligor failed to perform the obligation, resulting in a breach. *Id.* Finally, the failure to perform must result in damages to the obligee. *Id.* As the aggrieved party, the plaintiff bears the burden of proving these elements by a preponderance of the evidence. *See, Hayes Fund for the First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mt., LLC*, 14-2592 (La. 12/8/15); 193 So.3d 1110, 1115. Whether a defendant's actions caused the plaintiff's damages is a question of fact, which should not be reversed on appeal absent manifest error. *Id.*

*Bruneau v. Crescent City Cleaning Servs. Corp.*, 16-17, p. 5 (La.App. 5 Cir. 12/14/16), 209 So.3d 286, 290.

In determining whether Christus was the cause of any damage suffered by Dr. George, the jury and the trial court had an abundance of evidence to consider. Particularly relevant to this issue is the testimony of several key witnesses pertaining to the three areas of concern for Christus that resulted in the denial of Dr. George's request for reinstatement. These three areas of concern centered on the following reports and events:

1.  September 9, 2009 surgeries where it was alleged that Dr. George was unsteady, and potentially impaired, resulting in the cancellation of the third scheduled procedure after Dr. George could not be located.

2.  On July 21, 2009, Dr. George performed an anterior cervical discectomy with fusion (ACDF) on a patient at C5-6 and C6-7 when the surgical plan was only for a C6-7 level ACDF.

3.  Issues with poor charting and documentation including a lack of indications for surgery and incomplete informed consent forms.

During his testimony, Dr. George admitted that he breached the standard of care when he erroneously fused the patient's C5-6 level in addition to the intended C6-7 level during the wrong-level surgery and that it was reasonable for Dr. Raggio to refer this matter to the PRC. Through his testimony, he admitted that he attempted to cover up his mistake when his post-op report, dictated fifty-five days after the surgery, mentioned for the first time a pre-op diagnosis relating to the C5-6 level and that the patient consented to the two-level fusion prior to surgery. In his testimony, Dr. George admitted that the first time he discussed this level with the patient was following the surgery. Although he claimed that he "truthfully and honestly" dictated the post-op report to the best of his knowledge, he admitted that he did not inform her that he had actually fused the C5-6 level in error.

As to the events of September 9, Dr. George denied that he was impaired as a result of drugs or alcohol. He claimed that he was impaired due to fatigue because he had exchanged phone calls with his sister the previous night relative to their

16

mother's health and from his use of Benadryl that morning to counteract allergies he suffered while cutting grass the weekend prior to September 9.[11] He further admitted that he nodded off and bumped into a Mayo stand while off the sterile field during the second procedure, which resulted in a noise that startled some of the OR staff. However, he denied that he was at risk of falling when this occurred. Dr. George also admitted that he moved the wire from the proper disc level while withdrawing the needle from the patient. However, he stated that this was a common occurrence during this type of procedure and was easily remedied by the Medtronic reps.

While Dr. George denied that he experienced difficulty while suturing, he admitted that he had trouble threading a needle, which he blamed on his new eyeglass prescription, received on May 13, 2009. He stated that on the day of the procedure, he decided to wear his new glasses instead of an eye shield and his "depth perception was off because they were new eyeglasses and I hadn't grown accustomed to how you might adjust your vision to see through those glasses."

Dr. George testified that he was in the surgeon's dining room waiting for OR to notify him when the third procedure was cancelled at 11:15 a.m. He said he was competent to perform the procedure at that time, and he blamed the cancellation on the OR's failure to notify him. He said that he never received a call on his phone or over the intercom and that no runner was sent to locate him. When he did not hear anything, he went to his car to smoke a cigarette, after which he fell asleep. He further blamed his failure to receive any calls on AT&T transmission problems in the hospital and garage. Dr. George testified that upon returning to the OR, he was met by Mr. Leger and Dr. Engleking, taken to administration, informed of the impairment accusations, and asked to submit to a drug test. He said that he "was

---

[11] September 9, 2009, fell on a Tuesday.

17

taken aback by the allegations of [my] being impaired and felt like I was being singled out and mischaracterized and misjudged; so that's why I declined them the drug test." At that point, his privileges were suspended.

As to the AHS investigation of the September 9 incident, Dr. George admitted that he was impaired due to lack of sleep. While he agrees that Christus has a duty to investigate any concerns raised by OR staff pertaining to patient safety, he disagreed with the accusations and felt that the AHS failed to consider his input. Based on the advice of the DeBruhl defendants, he decided that it would be easier to request a LOA and undergo an evaluation for substance abuse through the PHFL than it would be to fight the accusations.

Although Dr. George adamantly denied that he used cocaine prior to his LOA, he admitted that he used it once after his October 9, 2009 release by Addiction Recovery Resources of New Orleans, following a five-day evaluation. He stated:

> Well, there was some concern, especially with my mother, regarding a family member. She asked me to go and check on him, and I did. I explained to him what was going on with me, after discussing what was going on with him; then I explained to him what was going on with me with the stress that I was under, all of the allegations of everything else, and all of this running around between Lake Charles, Natchitoches, and New Orleans. He suggested that you may want to try some of this, and so I did.
>
> It was an experimental type of thing. There [sic] was something that was done in poor judgment and in poor consideration of the overall events. I admit to that. That was a very dumb thing, but I was in somewhat of a despondent state and probably somewhat vulnerable to suggestion that you may want to try this.
>
> Again, I beat myself up about it. It was an awful mistake to make, and that's the end of the story.

Dr. George also denied that he tried to avoid providing hair or nail samples after he was informed by the PHFL that such a test was required before it would release him to return to the practice of medicine. He said that he knew then that he would test positive for cocaine as this was only weeks after the event recounted

18

above. However, Dr. George denied that he cut, shaved, or dyed his hair to evade testing as his hair looks bad when shaved, and he was using dye to cover his gray hair long before these tests were required. He further denied cutting his fingernails and toenails to avoid testing. He claimed that his fingernails are kept short to avoid having dirt under them when scrubbing for surgery. He further explained that he refused to provide a toenail sample because his toenails are ingrown, and they would hurt if cut with clippers.

Dr. George also admitted that while he was receiving treatment from Bradford Health after testing positive for cocaine, he initially told a healthcare provider that he tested positive after sleeping in a house where crack cocaine was being smoked. However, he acknowledged that this was untrue and that he eventually admitted that he actually smoked crack cocaine on that occasion. It was his opinion that he did not require treatment for substance abuse since he only used cocaine on one occasion. While Dr. George admitted that he also used cocaine once while he was in college, he denied that he told Dr. John Boutté, a psychiatrist who had evaluated him, that he used it once in 2007, or Mr. Ganucheau that he had used cocaine on September 9.

Dr. George testified that he was not aware on April 6, 2010, that recommendations to deny his request for reinstatement had already been made by the PRC on October 20, by the Chief of Surgery, Dr. Altier, and the CC on March 9, and by the MEC on March 16. He further stated that the March 17 letter was the first notice he had regarding his documentation deficiencies. Although his contract required that he undergo a retrospective review of all of his procedures by Dr. Raggio, he said that he was not aware that his FPPE had already been performed or that Dr. Raggio lacked privileges at Christus at that time.

As the April 6 meeting was an MEC rather than a PRC meeting, Dr. George felt that he only had to present documentation sufficient to establish the proper

19

indications for each patient's surgery. Thus, he handed out a summary of each patient's history, physical examination, and x-ray findings and had his office records with him. He admitted that he discussed none of Dr. Raggio's findings from the FPPE as he did not believe it appropriate to do so since there was no neurosurgeon present at the meeting.

Dr. George recalled no specific questions being asked during the meeting or Dr. Van Hoose's request that he specifically address the FPPE findings. However, he stated that his medical records were available to Dr. Van Hoose if he had any specific questions. When asked if he admitted that he breached the standard of care during the wrong-level surgery, Dr. George stated:

> I was never asked or given the opportunity to do that at the [MEC meeting], which was the only meeting that I attended, which had the wrong-level surgery to be addressed. I presented it as a two-level surgery, because it was not in a Peer Review format. If it were, presented in a Peer Review format, then yes. I would've been open and frank about the discussion.

Dr. George stated that after his request for reinstatement was denied, he decided to waive his right to an evidentiary hearing based on an agreement he claimed was reached with Christus regarding the language it would report to the NPDB. However, he stated that Christus's use of the term "unsafe practices" killed his chances of obtaining neurosurgery privileges at any other hospital and that he has not practiced neurosurgery since September 2009. Dr. George admitted that he tested positive for cocaine again following Christus's denial of his request and that he was notified by the Louisiana State Board of Medical Examiners (LSBME) on August 31, 2010, that he was being investigated as a result of his failure to note his September 9 suspension by Christus on his medical license renewal application.

Although Dr. George acknowledged the importance of record keeping and that, ultimately, it was his responsibility to see that Christus received the proper

20

documentation ahead of a patient's surgery, he blamed others for his deficiencies in this area. He claimed that his nurse was responsible for submitting the proper documentation to Christus prior to scheduled surgeries, and he only learned that she was failing to do so when he received the March 17 letter regarding the April 6 meeting. Dr. George further blamed Christus for failing to notify him that his medical records were deficient as required by the Medical Staff Rules and Regulations, and its OR staff for failing to inform him that his patients' charts lacked the proper documentation before allowing his procedures to go forward. He did admit, however, that his privileges had previously been suspended for deficient medical records prior to Hurricane Katrina.

As to his delays in submitting post-op reports, Dr. George admitted that he dictated seven post-op reports on September 14, following the first AHS meeting. While he agreed that a post-op report should be dictated as soon as possible following a surgery, he claimed that his delay was occasioned by his unfamiliarity with Christus's dictation system. This, he stated, was why he provided handwritten post-op notes immediately after each surgery. However, he agreed "that there was a trend in terms of deficiencies" in his record keeping.

Mr. Leger, Christus's Administrator, testified that he was responsible for the day-to-day operations of Christus, a Joint Commission certified hospital. He described the two main goals of the Joint Commission as ensuring "overall quality care that's patient focused and safe care with the best possible outcomes." He explained that the administrative side works collaboratively with the medical staff in providing patient care and that the medical staff is self-governed through committees made up of physicians. The medical staff is headed by an elected president, who liaisons with administration, and any actions taken by the medical staff's committees are ultimately decided by Christus's governing board.

21

Mr. Leger testified that the only patient safety concern he was aware of prior to September 9 was Dr. George's wrong-level surgery. He was not aware of any other issue that made him think that Dr. George would be a problematic physician. He testified that Christus's Risk Management Director and its Vice-President of Operations were notified by the Director of Surgical Services on July 21, 2009, that Dr. George had performed a wrong-level surgery. He stated that Dr. Raggio, who reviewed the surgery, stated in his August 18, 2009 report that there was very poor documentation, inadequate H&P, and no post-op report in the patient's chart. Dr. Raggio further recommended that Dr. George attend the next PRC meeting and that a 100% review of his procedures be performed. Mr. Leger stated that he found it significant that there was no post-op report in the chart as the Medical Staff Rules and Regulations require a post-op report to be dictated within twenty-four hours of a surgery. He explained that a post-op report summarizes what the surgeon did during a surgery and that the best practice is to complete it right after surgery while the procedure is still fresh in the surgeon's mind.

Mr. Leger stated that his sole focus on September 9, was patient safety, and based on the two OR staff member statements, sufficient concern was raised regarding patient safety to warrant the suspension of Dr. George's privileges. The statements reported that Dr. George appeared to be impaired in the OR, that he was very clumsy, had trouble suturing, appeared to doze off, and appeared about to stumble backwards during the second procedure. Regarding his perception of Dr. George after meeting with him on September 9, Mr. Leger denied that he smelled of alcohol, was incoherent, or that he stumbled. He said that based on the concerns raised, he, Dr. Engleking, and Dr. Gilmore decided to suspend Dr. George's privileges. He stated that although a suspension can last longer, one that lasts in excess of thirty days is reportable to the NPDB.

22

Mr. Leger testified that following Dr. George's suspension, the AHS was appointed by the Medical Staff to investigate and make a recommendation to the MEC. He stated that Dr. Gilmore informed the AHS that although Dr. George's wrong-level surgery and inappropriate behavior were also being referred to it, he wanted the AHS to focus on the impairment issue and the other two issues to be referred to the PRC.

Mr. Leger reported that Dr. George disagreed with his suspension during the first AHS meeting. He said that he was concerned when Dr. George did not recall that he and Dr. Engleking had asked him to submit to a drug test on September 9. He stated, "It was important for us. It's a typical process to where if we have concerns about potential impairment by a physician and if that physician is willing to work with us then a lot of times they will voluntarily submit to a drug test." It was his recollection that Dr. George said that there was no need for him to submit to a test.

Although he was not present at the September 16 AHS meeting, Mr. Leger acknowledged that Dr. George admitted to being impaired on September 9, due to sleep deprivation. He stated that Christus expects its physicians to be at their best when providing care, and a physician who is impaired should not be in the OR, no matter the cause of their impairment. He said that after being encouraged, Dr. George agreed to request a medical LOA and to be evaluated by the PHFL. He testified that while Dr. George was on LOA, he tested positive for cocaine despite evasive measures to avoid submitting a hair or nail sample by dyeing and cutting his hair and by cutting his nails short. He said that after Dr. George's positive cocaine test, he was required to undergo inpatient treatment for substance abuse.

Mr. Leger stated that Dr. George's substance abuse was considered by both the CC and the MEC regarding his request for reinstatement, both of which

23

recommended that his request be denied. He stated that Christus's major concern is always patient safety, and absent Dr. George's suspension on September 9, he would have continued to practice despite the other concerns raised. He further stated that Dr. George's attempts to avoiding testing and denial of any wrongdoing were familiar patterns that indicated he had a problem but was in denial therefrom. Mr. Leger testified that this raised concerns regarding his character and truthfulness, both of which were considered by the CC and the MEC when considering his request. It was his opinion that these committees acted prudently in denying Dr. George's request for reinstatement.

Dr. Raggio testified that he performed the FPPE on Dr. George's medical records to determine whether he met Christus's standards and was currently competent to perform neurosurgery. Prior to his 2007 retirement, he had privileges at Christus, Lake Charles Memorial, West Cal-Cam Hospital, Moss Regional, and Women and Children's Hospital. He stated that he was board certified in neurosurgery while he was monitoring Dr. George, and he was not involved in Christus's recruitment or hiring of Dr. George or any of the events which led to his September 9 suspension. He said that he did not participate in the AHS's investigation of Dr. George, and all of his opinions contained in the FPPE were fair and unbiased.

In clarifying the reason for reviewing Dr. George's medical charts, Dr. Raggio stated that it was his job to make sure the charts reflected that the certain standards required of a surgery by Christus had been met. He stated that the charts must reflect "what does the patient have, why is he there, what are we going to do, and that guides the surgeon and everybody involved as to what is going to happen to the patient." "[M]y job was to determine whether the documentation in the chart demonstrated that aspect of competency."

24

While reviewing Dr. George's charts, Dr. Raggio was concerned that rather than seeing improvement, he was seeing the same mistakes over and over again in his record keeping:

> There were chart deficiencies, just very – I'm trying to find a nice word for it. Careless and incomplete documentation, just everything concerning the patient. You know, the x-ray findings were not there sometimes. The physical exam was cursory. You know, it was just poorly documented charts. All the things that you need, the history, the physical, the radiographic findings, indications for surgery, either they were all not there in some cases or there were one or more deficiencies in cases over and over again in the entire list of cases that I reviewed.

Dr. Raggio testified that he was also asked to review the chart from the wrong-level surgery. He stated that his review revealed very poor documentation, inadequate pre-op history and physical and diagnostic study documentation, and no post-op report. He stated that the post-op report for the surgery was dictated by Dr. George on September 14. He stated that based on the chart, "it looks like the wrong level got operated on and then subsequently the correct level was operated on and so the patient had two levels of their cervical spine fused instead of the preplanned one level."

Dr. Wolf, a board-certified neurosurgeon, testified that he observed Dr. George during his first three cranial procedures at Christus in accordance with Dr. George's monitoring plan. He noted only a minor charting/documentation issue in the first procedure on April 25, 2009, a craniotomy for an intracerebral hemorrhage. He provided input to Dr. George on how to rectify the documentation issue. He stated that he noticed no quality-of-care concerns in Dr. George's performance during the procedure.

Dr. Wolf testified that the next procedure was performed on May 1, 2009, a craniotomy for the removal of a meningioma tumor. He had quality of care concerns, and the peer review form states, "Elective case done with Plavix held only five or so

25

days. This is at physician [sic] discretion, but full platelet recovery takes longer." Dr. Wolf explained that an elective surgery typically is not performed on a patient with a low platelet count, and if a patient is on Plavix, as a surgeon cannot rely on the patient's CBC[12] to determine whether their blood will properly clot if they have been on Plavix. Thus, Dr. Wolf stated that it is best to hold the patient's Plavix for seven to ten days to ensure that their platelets have adequately recovered from being on Plavix. He said that in this instance, the patient appeared to clot adequately and suffered no complications from the surgery.

Dr. Wolf testified that he noted no quality-of-care issues during the third surgery on May 27, 2009, a stereotactic brain biopsy. He did not recall providing Dr. George any further advice regarding paperwork and, other than the Plavix issue, he recalled no further discussion concerning quality of care issues.

Dr. Wolf testified that he also participated in the September 15 PRC review of Dr. George's wrong-level surgery, during which he stated that based on the MRI results, he would not have performed surgery on the patient. Additionally, Dr. Wolf stated, patient safety requires a patient, after being informed of the material risks associated with a surgery, to consent to that surgery identified by their consent form. He said that for spine surgeries, the consent form should indicate the exact level of the spine at which surgery is intended.

As to Christus's Medical Staff Bylaws and Rules and Regulations, Dr. Wolf agreed that the medical staff should provide quality medical and surgical care to patients; that all staff members should have excellent moral and ethical character; that surgeons should work collaboratively with all OR staff members; that medical staff should maintain timely and accurate medical records; that hospital privileges

---

[12] Complete blood count.

are privileges rather than rights; and that the granting of privileges should be based on an applicant's demonstrated current competence, judgment, and health status. He further agreed that because documentation is a significant component of quality health care, it is one of the factors evaluated during a proctorship.

Dr. Wolf stated that it would have been important to him had Dr. George exhibited signs of impairment while being proctored. When asked if he, personally, had ever been impaired such that his ability to perform a surgery was impaired, he answered, "Absolutely not." He opined that "[i]t is never appropriate to enter the operating room, much less the hospital, if you're an impaired physician." He further stated that he has never been involved in a surgery where a surgeon nodded off while not actively involved in the surgery taking place.

Dr. Altier, an anesthesiologist, testified that she held privileges at Christus and all other Lake Charles/Sulphur hospitals between 2004–2016, after which she retired. Dr. Altier opined that Dr. George's loss of privileges was due to performance issues rather than documentation issues. She stated that the first issue listed in the March 17 letter to Dr. George, "[q]uestionable indications for surgery, due to poor documentation and lack of supportive data (e.g., radiographic findings, neurologic exam findings) in the chart to justify procedure[,]" was a major issue. She explained, "The problem is the indication for surgery. It's not the poor documentation. Dr. George did not explain why he wanted to do a procedure or not."

Dr. Altier agreed with Dr. Wolf's comments regarding the May 1, 2009 elective procedure performed by Dr. George wherein the patient's Plavix was held for only five or so days. She stated that it is standard in non-emergency surgeries to hold a patient's Plavix for longer than five days, and she agreed that the patient's Plavix should have been held in this instance for at least ten days as the procedure

27

involved was elective. She explained that a patient's safety could be endangered if their Plavix is not stopped properly.

Dr. Altier stated that the CC's recommendation to deny Dr. George's request for reinstatement was based on peer-review issues rather than his impairment issues. While noting the importance of an opinion based on all of the available facts, she testified that some issues were indefensible, such as documentation, consent, or performance, such as the improper holding of Plavix for an elective procedure. Dr. Altier further indicated that Dr. Wolf had opined that the wrong-level surgery performed by Dr. George was not indicated and that there were problems with his technique. When asked how a peer-reviewer could judge Dr. George's surgical skills if they were not present during the procedure, she stated that the information was obtained from Dr. George's charts.

Dr. Mark Kessner, a surgeon, testified and was accepted as an expert in hospital administration, medical staff affairs, and particularly the work of Christus's committees and staff during its investigation of and its action plan for Dr. George. Dr. Kessner expounded on Christus's duty to report patient care and safety issues to the NPDB, stating "facilities are extremely bound to the idea that once they've identified a problem, they need to report it to the [NPDB], otherwise they compromise their accreditation by the Joint Commission."

Dr. Kessner opined that Christus acted appropriately in reporting Dr. George based on the information it had as its decision was made by the medical staff based on quality health care standards. He stated that the AHS and PRC investigations were two reasonable decisions by Christus's Medical Staff for dealing with the concerns raised by Dr. George's conduct:

> That was a decision by the infrastructure of the medical staff; and what they are trying to create is a quality of care that they agree with. That each physician that's on their medical staff is a reflection of themselves.

28

So if you have a concern about a physician and the way in which they're practicing, you want to address that with them and then hopefully they will improve over time or you as an organization reject that provider because they're not practicing to a standard that you feel is appropriate.

Margaret O'Donnell, Christus's corporate counsel, explained that a hospital is required to provide peer review to be certified by the Joint Commission. She described the NPDB as a clearinghouse for the collection and dissemination of adverse information pertaining to physicians and other healthcare providers. She further testified that Congress further provides hospitals and physicians that participate in peer-review activities with immunity from civil fines and prosecution provided they follow the guidelines and rules and regulations set forth in 42 U.S.C. § 11112. A hospital's violation of the standards or its failure to accurately report information to the NPDB can result in a maximum of three years loss of immunity.

Ms. O'Donnell stated that Dr. Gilmore and Dr. Engleking both used the terms "dangerous" and "unsafe" in relation to Dr. George's actions following the September 9 incident, and she recalled numerous conversations pertaining to "the unsafe practice of Dr. George's clinical competency and professional conduct[]" during the May 5, 2010 MEC meeting. These MEC discussions pertained to the totality of Dr. George's tenure at Christus, including his FPPE, his character issues, and his credibility. Ms. O'Donnell said that the MEC had determined that "there was no path that we discussed or could come up with to ensure patient safety because I remember specifically we weren't going to wait for another incident to occur and then say, okay stop."

Ms. O'Donnell testified that the committee that triggered an adverse action that was reportable to the NPDB was the MEC as the other committees only provided recommendations to the MEC. Thus, the MEC's decision not to reinstate Dr. George triggered an adverse action, which Christus had to report to the NPDB unless Dr.

29

George requested an evidentiary hearing within thirty days of its decision. He did not do so. She stated that Christus reported its action to the NPDB on May 20, 2010, the day after its governing board affirmed the MEC's recommendation not to reinstate.

Ms. O'Donnell stated that although she had many conversations with Mr. Ganucheau regarding the information Christus would report in the first 2 sections of its adverse action report to the NPDB, there was no agreement as to the language Christus would report in the third or free-text section of the report. She explained that Christus inserted code "1610 Revocation of Clinical Privileges" in the first section of the report to indicate that Dr. George's privileges were being terminated. It then inserted code "F6 Substandard or Inadequate Care" in the second section and inserted "[r]evocation of privileges due to unsafe practice and substandard care[]" in the free text section because the section containing the F6 code was entitled, "Unsafe Practice or Substandard Care[.]" Ms. O'Donnell explained that this "was the bare minimum the hospital would report based on accurately reflecting the serious concerns the medical staff had about Dr. George's practice[]" during his five months at Christus. She testified that because Christus was required to report its actions completely and accurately, the language it would insert in the free-text section was non-negotiable.

Ms. O'Donnell testified that following Christus's NPDB report, the LSBME investigated Dr. George after he failed to report his September 9 suspension on his November 2009 medical-license-renewal application and failed to fully disclose the circumstances of his May 2010 revocation of privileges in his November 2010 application. As a result of this investigation, Dr. George entered into a July 18, 2011 consent order with the LSBME, whereby, in addition to other conditions, his medical license was placed on probation for three years, and he was restricted from practicing

30

neurosurgery for two years. She agreed that although Dr. George had a right to an evidentiary hearing before the LSBME, he waived that right just as he waived his right to an evidentiary hearing following the MEC's April 6 decision to deny his request for reinstatement.

Ms. DeBruhl, an attorney with Kathleen L. DeBruhl & Associates, L.L.C. testified that the DeBruhl defendants began representing Dr. George in September 2009. She stated that the story related by Dr. George following the September 9 incident was "all over the place[:]"

> It was a combination of that he – the September 9th events were that he directly told us that he had taken some form of medicine. My recollection was that he claimed that he had been clearing pecan trees or something and so it caused him to have to take medicine the next day and I thought it was an antihistamine or something like that that caused him to be sleepy. The day of the three surgeries, in the September 9th surgery, I can't remember which order, I do remember that the last patient he was asleep in his case, but I remember that the first surgery was the fact that he did not insert the device or something correctly and that the device rep had to actually – there was something wrong with the way he had done that. The second surgery was he had backed up against a wall while they were completing a surgery and literally fell asleep against the wall and he knocked some carts or something like that. He told us he had fallen asleep, and the third surgery, my recollection was that he had indicated to the staff to let him know when the patient was identified and that he had gone off to get a rest and his phone did not work. He had gone off and fallen asleep in his car, but his phone didn't work. So, the patient had been identified and then obviously, you know, delivered anesthesia and then he was not able to be found and his phone didn't work in the parking garage or something like that.

Ms. DeBruhl stated that they subsequently learned that Dr. George had also performed a surgery inappropriately, that the breach of his agreement with Christus could potentially allow it to recoup all of the amounts paid to him, and that "[t]he loss of his potential privileges would've affected his license[.]"

Ms. DeBruhl stated that she emailed Christus seeking to have Dr. George's summary suspension vacated so it would not be reported to the NPDB at the end of the thirty-day deadline. However, this, she said, did not relieve Dr. George of the

31

responsibility of reporting his suspension to the LSBME as the question on the medical-license renewal application asks whether the applicant has "ever been suspended, not the fact that a suspension was terminated" or resolved. She stated that the question is to determine whether a suspension has ever occurred. She subsequently learned that Dr. George had also failed to accurately fill out his 2010 application.

Ms. DeBruhl testified that they communicated multiple times and ways with Dr. George regarding the possible information Christus could report to the NPDB. She stated that there were also discussions with Dr. George pertaining to "the use of the F6 substandard care and the fact that it was going to state his not getting his reinstatement and that we could not have any – we didn't have an agreement with respect to the free-text." It was her opinion that Christus's report to the NPDB complied with their negotiations since it contained the "F6" code. However, she admitted on cross examination that she said in her deposition that the report did not contain the agreed upon language.

Ms. DeBruhl testified that Dr. George's summary suspension was very serious, and their most important goal was to protect his medical privileges by requesting a leave of absence, which Christus granted. She stated that they were aware that Dr. George tested positive for cocaine while being evaluated through the PHFL. She said that after Dr. George entered treatment, they heard nothing from him until his request for reinstatement was denied following the April 6 MEC meeting. At that point, Dr. George was facing another thirty-day deadline in which to decide if he wanted an evidentiary hearing to review the MEC's decision. She said they were shocked when they received a copy of the April 6 letter and Dr. George's FPPE, as these revealed additional clinical issues on his part.

Ms. DeBruhl testified that during an April 16 meeting with Dr. George, he revealed the difficulties he was having with Christus, including that he had a difficult staff, did not feel he was being treated fairly, and a chaotic office staff. They discussed alternatives and the idea of a hearing to contest the denial of his request for reinstatement, what it would take to have a hearing, and the legal costs of such, which she estimated at $100,000.00.

As Ms. DeBruhl doubted that Dr. George would be successful with an evidentiary hearing, she recommended, instead, that they "try to mitigate what was potentially reported to the data bank to give him the best show [sic] that we thought we could give him in order to move on with his life." Ms. DeBruhl testified that they notified Christus on May 12, 2010, that Dr. George was waiving the evidentiary hearing. She said that they eventually notified Dr. George that they were no longer representing him after the PHFL reported that he had tested positive for cocaine in July 2010.

Mr. Ganucheau, an attorney with Kathleen L. DeBruhl & Associates, L.L.C., testified that Dr. George was kept abreast of his negotiations with Christus regarding the information it would report to the NPDB. He testified he discussed with "the hospital and Ms. O'Donnell about the words that were going to be used, what the basis of the action was, which they did actually use the F6 number[,]" and although "[w]e did not expect to see the word 'Unsafe practices,' and that was added to the form; but that was added in the free text box, which we were well aware could have contained anything. And I explained that to Dr. George." He went on to testify in more detail:

> I told Dr. George that the hospital could not enter into a contract or written agreement on this. I explained that very well to him multiple times, both on the phone and in person.

33

Dr. George is a very brilliant man. I expected that he understood and he asserted that he did understand that we couldn't enter into a contract, but we would do our best with Ms. O'Donnell to get a report that had as little information as possible that could be later used, and the opportunity for us to present a statement that asserted all the reasons why he disagreed with the actions of the hospital.

The following colloquy then took place:

Q. Tell the jury the repercussions. If the hospital used words other than "Substandard" or "Inadequate" care, what did you tell Dr. George would be the consequence of that?

A. There's no additional consequence to that if the actual reason Dr. George had difficulties getting new privileges at other facilities was not because of the Data Bank report.

Mr. Ganucheau confirmed that Dr. George tested positive for cocaine use and that he had changed his story as to what occurred when he "fell asleep" during the September 9 incident. He acknowledged that as time unfolded, the scope of Dr. George's issues became much wider and more difficult, expanding from his impairment issue to some thirty other issues or "cases" related to his actions at Christus. He testified regarding the problems Dr. George would possibly have experienced had he gone forward with an evidentiary hearing:

[A]ll of the information that we've [sic] trying to keep kind of down low and quiet, all would come out. He'd have to explain September 9th. He's likely to have to testify with regards to the drug use. He's going to have to -- he also has a situation where they could possibly bring up his application to the hospital, that it was false because he failed to list that he had been on disability.

Mr. Ganucheau stated that he and Dr. George discussed the issue of his FPPE being performed by Dr. Raggio, who although not currently on staff, had previously been on staff at Christus. He stated, however, that this was not a significant issue that was favorable to Dr. George as it would only have resulted in a delay if Christus "thought it was sufficient to cause an issue with their fair hearing, they would have just had it fixed. They would have had somebody else go through them all and they would have found the exact same things."

34

Dr. Noble, an orthopedic surgeon, testified that regarding the PRC's September 15 review of the wrong level surgery, the lack of documentation in the patient's chart led to confusion amongst the OR staff as to the procedure Dr. George intended. The consent form was blank when the patient entered the hospital, the H&P did not indicate the level to be fused, and the OR staff thought the fusion was being performed at C5-6. However, Dr. George did clarify prior to surgery that the procedure was planned for C6-7. Dr. Noble stated that although the patient consented to a single-level fusion at C6-7, Dr. George first fused and plated the C5-6 level and then decided to also fuse and plate the C6-7 level. This required Dr. George to remove the plate at C5-6 as it is difficult to place plates adjacent to each other.

Dr. Noble opined that this was a clear indication that the surgery was performed at the wrong level since a plate is not inserted until the fusion is completed. He further opined that Dr. George's error was "a very big deal[]" as the PRC does not want physicians in its community performing unnecessary surgeries. However, he admitted that he has encountered conditions during surgery that were not included in his pre-op diagnosis, and which required correction. He further agreed that while Dr. George "screwed up[]" during the surgery, wrong-level surgeries do occur in neurosurgery.

Dr. Noble noted that based on the information considered, the PRC concluded that the patient's H&P failed to document the level to be fused and was not completed by a privileged nurse practitioner, that Dr. George fused the wrong level, that he ignored OR staff's warnings regarding the correct level, that he was not careful in choosing the site to be fused during the surgery, and that the consent form was poorly filled out. As a result of these findings, the PRC ordered Dr. Raggio to perform a retrospective review of all of Dr. George's surgeries, which was presented to the PRC on October 20.

35

Regarding the October 20 PRC meeting, Dr. Noble found it very alarming that Dr. George received "so many unsatisfactory remarks from Dr. Raggio given that he was so early in his tenure at" Christus, most of which dealt with documentation. He stated that since Dr. George had been at Christus such a short time, all of the issues raised, including his FPPE, would be considered upon his request for reinstatement. Dr. Noble testified that based on the findings of the FPPE, the PRC voted unanimously not to reinstate Dr. George's privileges due to a "reoccurring pattern of concern and poor documentation."

Dr. Noble stated that during the March 16 meeting, the MEC's main concern was patient safety and that it ultimately decided to notify Dr. George that his request was not being granted at that time based on the PRC's recommendation and due to serious concerns raised by his FPPE. He asserted that the March 17 letter clearly notified Dr. George about the concerns being considered by the MEC and that it was crucial that he attend the April 6 meeting to discuss in detail the cases listed in his FPPE. He explained that depending on the reasoning provided by Dr. George, Dr. Raggio's findings could have been reversed and the matter reconsidered by Dr. Raggio, the PRC, and the CC.

Dr. Noble testified that during the April 6 meeting, Dr. George broadly claimed that all of his patients were doing fine and that his patient care had involved nothing improper. He stated that although Dr. George provided some documentation, it was not very detailed, and he did not offer the MEC his medical records even though he had them at the meeting. It was his opinion that Dr. George was in denial regarding any possible issues involving his patient care. He testified that the MEC also had concern about whether Dr. George was trustworthy or was taking the process seriously as he never acknowledged his error in fusing the C5-6 level during the wrong-level surgery. He further testified that he had no concerns

36

about Dr. Raggio's qualifications to perform Dr. George's FPPE or whether his review was in accordance with Christus's standard of care.

Regarding Dr. George's claims as to why OR could not locate him on September 9, Dr. Noble testified that the maximum turn-over time between surgeries is approximately one hour, so it was unprecedented that Dr. George was unavailable for three hours. He added that Dr. George's failure to show up was "a serious breach in medical care."

In addition to debunking Dr. George's claim that he had decided preoperatively to perform a two-level fusion on the patient during the wrong-level surgery, Dr. Noble further opined that the patient experienced an adverse outcome as she has a greater chance of experiencing a transitional syndrome from the increased stress placed on her spine above and below the two fused levels.

Dr. Noble testified that the MEC's recommendation to deny Dr. George's request for reinstatement was based on "'a questionable indication for surgery, poor documentation, deficiencies in consent forms, inadequate histories and physicals, poor documentation [in] medical records, specifically not improving over time.'" He stated that at its May 5 meeting, the MEC consulted with Ms. O'Donnell about the language Christus would use to report its actions to the NPDB. As to its use of "unsafe practices," Dr. Noble asserted that the MEC "had deemed that [Dr. George's] unsafe practice was the reason we were denying privileges." As to whether Christus could have taken any other action other than revocation regarding Dr. George, he stated that there was none. He explained:

> If you want my personal opinion, there was an alarming pattern of behavior here; and we went through the process [in] the way that the process is supposed to be done. He had an opportunity to come to us to vouch for his care, and he chose not to do that; so I'm not exactly sure what else we should have done.

37

Dr. Van Hoose, a pathologist, testified that during the October 20 meeting, the PRC voted to deny Dr. George's request for reinstatement based on the findings of his FPPE. He did not feel that the PRC required any further investigation or needed to hear from Dr. George since all of the issues raised by the FPPE, the wrong-level surgery, and his impairment would ultimately be decided by the MEC. He testified that during the April 6 meeting, Dr. George was given the opportunity to explain or rebut the information already known by the MEC regarding his wrong-level surgery, his poor documentation, and the impairment issue. According to Dr. Van Hoose, Dr. George provided the MEC "a generalization of there's no problem here." Despite Dr. George's assertion that he could provide indications for each of his surgeries, Dr. Van Hoose stated that the failure to include such information in the charts "basically proves the issue of poor documentation."

Based on Dr. George's failure to fully respond to issues, it was Dr. Van Hoose's opinion that the MEC had nothing to counter that which it already had. He explained:

> We had all this information already, as I mentioned, about the wrong-site surgery, the poor documentation, the FPPE issues, and the impairment; so we had all of that from the various sources that that had been gathered, and what we were lacking was his explanation on that, but we never got that.
>
> So it's not our responsibility to get that from him. That's his responsibility to give that to the Committee to make that determination. So without that, then we're only left with all the other information that we had.

According to Dr. Van Hoose, the MEC voted unanimously to deny Dr. George's request for reinstatement. He opined that it believed that the denial was warranted by the facts, and he denied that any member of the MEC bore ill will towards Dr. George or acted towards him with malice. Rather, he stated, there was "concern over all the issues that had been raised, because there were so many of

38

them." Dr. Van Hoose testified that the MEC had no concerns about Dr. Raggio performing Dr. George's FPPE as he had been known as an excellent surgeon for years. It was further his opinion that the MEC's recommendation to deny Dr. George's request was the right recommendation.

Ms. Van Winkle, the Medical Staff Services Manager, testified that Christus offered Dr. George provisional privileges on January 9, 2009, provided he agreed to be monitored prospectively, concurrently, and retrospectively. The prospective and concurrent monitoring was to be performed by Dr. Raggio, a retired staff member, with Dr. Wolf or Dr. Rubino, neurosurgeons, scrubbing in on cranial cases. The retrospective case review was to be performed by a staff member with neurosurgery privileges.

Although Ms. Van Winkle had heard no complaints about Dr. George's competency prior to September 9, she knew that there had been a discussion with him regarding his interactions with OR staff and that he had been counseled that it would take time for him to get to know the staff. She was also aware that Dr. George complained during that discussion about the quality of the equipment available in the OR suite he was using.

Regarding the events of September 9, and thereafter, it was Ms. Van Winkle's opinion that Christus acted appropriately in its suspension and ultimate denial of Dr. George's privileges. She stated that the scrub tech appropriately reported Dr. George to Christus's leadership on September 9, after he was unable to suture the patient during the second procedure. She stated that the concerns regarding patient safety raised by the two OR staff members triggered the corrective action taken by Mr. Leger in summarily suspending Dr. George's privileges.

Regarding the impairment issue, Ms. Van Winkle testified that Christus utilized a policy it had in place for identifying and managing an impaired physician,

39

which included the confidential referral for evaluation and/or treatment and "continued monitoring following adequate stabilizing treatment." She said that the AHS was quickly formed to investigate Dr. George's suspension since a suspension of greater than thirty days would require Christus to notify the NPDB. Ms. Van Winkle stated that Dr. George was notified about and was present at both AHS meetings, and he agreed with the AHS's recommendation that he undergo an evaluation through the PHFL, after which he requested and was granted a medical LOA.

Ms. Van Winkle further testified that the investigations into Dr. George's quality of care issues also complied with Christus's policy of conducting "effective peer review (focused review)" "in an effort to provide continuous assessment and improvement of patient care." She claimed that Dr. George was treated no differently from other physicians at Christus as all physicians are required to submit to quality and peer reviews to ensure the quality of their care. She acknowledged that he was not present at the September 15 PRC meeting or that he was at the October 20 PRC meeting as he was on LOA. She stated that she was not aware of any policy requiring notice to be sent to physicians on LOA.

Ms. Van Winkle was aware that Dr. George tried to evade the hair/nail test required by the PHFL and that he had tested positive for cocaine and was subsequently treated for substance abuse. She said that his February 2010 request for reinstatement triggered the CC and the MEC meetings to consider his request. She stated that the CC, which met on March 9, recommended that his privileges not be reinstated based on the Chief of Surgery's and the PRC's recommendations and on the findings of the FPPE.

Although Dr. George stated that he disagreed with the findings of the FPPE, Ms. Van Winkle testified that he failed to present any documentation to refute those

40

findings during the April 6 MEC meeting. Thus, the MEC recommended that his request be denied based on the recommendations of the Chief of Surgery, the PRC, the CC, and his FPPE. She stated that after the Board affirmed the MEC's recommendation to deny Dr. George's request, she, with the advice of Ms. O'Donnell, reported Christus's actions to the NPDB. She said that she was later requested to provide Dr. George's records to the LSBME.

Ms. Van Winkle denied that any of Christus's committees wanted Dr. George to fail. She claimed that they had a vested interest in his success based on the shortage of neurosurgeons in Lake Charles, and as reflected by Dr. Wolf and Dr. Raggio's agreement to proctor him. She further stated that Dr. George never expressed any reservations about being proctored by Dr. Raggio despite his claim in his June 29, 2010 rebuttal to the NPDB that Dr. Raggio lacked the requisite credentials to proctor him.

Ms. Van Winkle testified that as a condition of being granted provisional privileges, Dr. George was required to abide by Christus's Medical Staff Bylaws and Rules and Regulations, including procedures pertaining to consent forms, corrective actions, H&P, post-op reports, peer review, and focused peer review. She stated that concerns raised regarding patient safety can result in various levels of corrective actions, whereas a summary suspension is utilized to prevent imminent danger from occurring to any person.

Dr. John Clifford, a board-certified neurosurgeon, testified on behalf of Dr. George. He was accepted as an expert in neurosurgery, credentialing oversight, and peer-reviews. He discussed his opinions regarding charting and patient safety, including the question of possible unwarranted surgery:

> Q. Well, let's talk about quality of care, though. If a physician, if one neurosurgeon looked at another neurosurgeon's records and saw that, you know, a couple of times that physician didn't think

surgery was warranted, is that sufficient information to make a judgment about the physician?

A.    No.

Q.    Would you explain that to the jury?

A.    Sure. This is part of the reason you do second opinions. You know, if somebody says I think this patient needs surgery, you know, and somebody else says, well, let's ask somebody else what their thoughts are, and another doctor will go by and see the patient. Well, I'm not sure if there's enough complaints here. This patient's finding on his examination and his findings on his diagnostics don't support this, I would not operate on him, I would not operate on this patient or you get a second opinion going the other way. I wouldn't do surgery. I want a second opinion to see if you need to be operated on, and you send him to another physician and he will look. Yeah, I probably would consider operating on that patient, you know, but that's a judgment factor. That's something that you make at that time, but it's important to have that easy flow of information.

In his opinion, from reviewing the medical charts, Dr. Clifford saw no trends or patterns with Dr. George's quality of health care but did note the wrong level surgery. He vehemently disagreed with Christus's decision not to reinstate Dr. George's medical privileges, and he disagreed with Christus's reporting of "unsafe practices" on the part of Dr. George to NPDB.

On cross examination Dr. Clifford stated that he has no qualms about Dr. Raggio's qualifications and skills to evaluate Dr. George's cases. He stated that he was not questioning or "criticizing to the jury the makeup of the committees at [Christus] that were looking into Dr. George's issues[.]" He admitted that issues with proper documentation by a physician can be a "potentially big deal[]" as far as patient safety is concerned. The following discussion later took place regarding documentation.

Q.    Do you still feel as we talked about in your deposition that Dr. George's overall records were sorely lacking in documentation?

A.    Yes.

Q. And that they don't meet your standard of expectation for a neurosurgeon?

A. That's correct.

Q. And do you still feel that in reviewing the totality of the records there were multiple episodes where he did not meet the standard of care?

A. As you defined it, yes.

Dr. Clifford also admitted that the wrong level surgery performed by Dr. George was "a significant event" and a "violation of the standard of care" with significant potential safety risks to the patient. He admitted that having no informed consent in the record is potentially a "big deal" and that the Joint Commission and the hospital bylaws require it. As to the wrong level surgery, he agreed that there were "no clinical findings to indicate the need to do both of these levels in the spine[.]" He admitted that he had not "focused a lot on the drug aspect or the substance abuse aspect of this case[.]"

Kayla Pleasant, the circulator nurse during the September 9 procedures, testified that Dr. George was rough with his hands and had difficulty suturing during the second procedure. However, she agreed that she stated in an affidavit that he "was always rough with the procedure." She further denied that Dr. George's speech was slurred and that he was off balance during the procedures. She did admit that Dr. George leaned on the Mayo stand and closed his eyes while Medtronic reps were checking the placement of the leads, after which he had "difficulty suturing down the leads due to apparent dexterity issues in his hands."

Nurse Pleasant testified that the first patient on September 9 was taken to the OR at 7:45 a.m. The second patient was taken to the OR at 9:15 a.m. and the surgery ended at 10:12 a.m., and Dr. George left the OR after the procedure was finished. She stated that the third patient was started on anesthesia in the OR at 10:45 a.m. As

43

far as she knew, no one reported Dr. George to the charge nurse on September 9, or tried to stop the third procedure from proceeding. She testified that as patient safety is the preeminent concern, she would have notified the charge nurse had she had any concerns about Dr. George. She stated that she had no objection to the third procedure going forward, and if Dr. George had been located, it would have proceeded. She further did not recall being asked her opinion regarding Dr. George's behavior on September 9. As to his difficulty in suturing, Nurse Pleasant agreed that he was uncoordinated and that it was possible that this resulted from a difficulty with depth perception.

Several witnesses were called essentially as character witnesses for Dr. George. These included his former wife, former employees, and a colleague. All said that they had not witnessed or experienced any indications that Dr. George had any issue with drug or alcohol addiction or use. Dr. Timothy Best, a neurologist, testified that he knew Dr. George prior to his move to Lake Charles, had trained with him for several years at Tulane and had referred surgical patients to him following his relocation to Lake Charles. He did not recall any issues regarding Dr. George's treatment of the patients referred to him, and he wrote a letter on behalf of Dr. George dated September 10, stating that he had lunched with Dr. George the previous day and had witnessed no signs of physical or mental impairment. He further stated during the time that Dr. George had been on Christus's staff, he had dealt with him from time to time over patients and had never seen anything to suggest that he had a drug or alcohol problem.

After considering the testimony and evidence, we find that there was not such overwhelming evidence in favor of Dr. George that reasonable minds could have reached a different conclusion as to the element of causation. Given the myriad of issues as to Dr. George's fault, any jury could have reasonably concluded, as this

44

one did, that Dr. George caused the suspension and ultimate denial of his medical and surgical privileges. The same is true of the jury's decision that Christus made no representations concerning what it would or would not report to the NPDB. Christus was under a legal duty to report Dr. George's conduct to the NPDB, and it also had an overriding moral and legal duty to protect its patients' safety. In this instance, it satisfied both duties. The fact that the LSBME placed Dr. George's medical license on probation for three years and restricted his ability to perform neurosurgery for two years was not the fault of Christus.

It is obvious from the record and the verdict form that while the jury found that Christus technically breached some of the obligations owed to Dr. George under their contract, such as its possible notification failures and its use of a retired physician to monitor and evaluate his procedures, these breaches did not cause his failure to gain the reinstatement of his privileges. Any damages suffered by Dr. George resulted from his own actions, by the very conduct that resulted in the loss of his privileges in the first place. Throughout the entirety of the reinstatement review process, Dr. George acted in a cavalier fashion by rationalizing his behavior, attempting to blame others for his actions, resisting drug testing, and so on.

In *Causey v. St. Francis Medical Center*, 30,732, p. 5 (La.App. 2 Cir. 8/26/98), 719 So.2d 1072, 1075, the second circuit noted the important role played by physicians in society: "Physicians are professionals and occupy a special place in our community. They are licensed by society to perform this special role. No one else is permitted to use life-prolonging technology, which is considered by many as 'fundamental' health care." This role highlights the necessity for the highest of ethical and professional conduct by physicians towards their patients and the healthcare institutions in which they practice. Here, the record shows that Dr. George sidestepped his professional and ethical obligations both to his patients and to

45

Christus, who had permitted him to provisionally practice medicine within the walls of its institution. Accordingly, it was not manifestly erroneous for the jury to find that Christus, despite its technical breach of contract, was not the cause Dr. George's failure to be reinstated, and thus, was not the cause of any financial loss suffered by him as a result of the loss of his privileges or the NPDB adverse action report. There was an abundance of evidence to support that decision. Thus, the trial court improperly substituted its own opinion for that of the jury in granting the JNOV on the issue of causation, as reasonable minds could certainly differ over that outcome.

We further find that it was legal error for the jury to allocate a percentage of fault and assess damages against Christus when there was no causative relation between its conduct and Dr. George's alleged damages. We can only speculate as to why the jury proceeded as it did, but we do note the lack of instruction given in the very confusing jury verdict form presented thereto. Given that it answered "No" as to the issue of causation, it should have been instructed not to answer questions as to the allocation of fault to Christus or the assessment of damages attributable to it.[13] The trial court furthered this error when it increased Christus's percentage of fault from 8% to 35%. Our reversal of the JNOV and reinstatement of the jury verdict finding no causation between Christus's conduct and his claimed damages is fatal to Dr. George's claims. Accordingly, the judgment granting the JNOV as to causation and the assignment of fault to Christus is reversed, and the jury's finding of no causation on the part of Christus is reinstated. We further reverse the judgment denying Christus's motion for JNOV and render judgment granting a JNOV in its

---

[13] We note that the jury also answered "No" to whether Dr. George proved that Christus made any representations regarding what would be reported to the NPDB, but that despite this answer, the jury was allowed to answer questions as to whether Dr. George relied on any such assurances. These questions and responses were inappropriate when no assurance was found to have been made.

favor, finding it not liable for Dr. George's alleged damages, and dismissing his claims against Christus, with prejudice.

*Remaining Assignments of Error*

Based on the foregoing, we find that all remaining issues are rendered moot. This includes Christus's claim that the jury erred in finding that it was not entitled to the immunity provided by 42 U.S.C. § 11111 of the Health Care Quality Improvement Act, as the finding of a lack of causation brings about the same result. Further, while Dr. George claims that comparative fault should not have been applied to reduce the amount of damages awarded for a contract claim, the finding of no causation renders that assignment of error moot, as it also renders the calculation of damages moot.

### DECREE

The judgment of the trial court granting a judgment notwithstanding the verdict in favor of Dr. Bryant George and Dura Mater, Inc. is reversed, and the jury verdict finding that Dr. Bryant George and Dura Mater, Inc. failed to prove causation for damages is reinstated. We further render judgment granting a judgment notwithstanding the verdict in favor of Christus Southwestern Louisiana d/b/a Christus St. Patrick Hospital, finding that it was not the proximate cause of the damages suffered by Dr. Bryant George and Dura Mater, Inc. Accordingly, the claims of Dr. Bryant George and Dura Mater, Inc against Christus Southwestern Louisiana d/b/a Christus St. Patrick Hospital are dismissed, with prejudice. Dr. Bryant George and Dura Mater, Inc. are ordered to pay all costs of this proceeding, including the costs of this appeal.

### REVERSED AND RENDERED.

47